UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
(Greenbelt Division)

_____

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION | : | |
|     100 F Street, N.E. | : | |
|     Washington, D.C. 20549 | : | |
| | : | |
|     Plaintiff, | : | |
| | : | |
| vs. | : | Civil No. |
| | : | |
| CHENG YI LIANG, | : | |
|     511 Skidmore Blvd. | : | |
|     Gaithersburg, MD 20877 | : | Jury Trial Demanded |
|     (Montgomery County) | : | |
| | : | |
|     Defendant, | : | |
|   and | : | |
| | : | |
| YI ZHUGE, ANDREW LIANG, HUI JUAN CHEN, | : | |
| ZHONGSHAN CHEN, SHUHUA ZHU, and | : | |
| HONAMI TODA | : | |
| | : | |
|     Relief Defendants. | : | |

_____


**COMPLAINT**

Plaintiff United States Securities and Exchange Commission ("Commission"), for its

Complaint against Cheng Yi Liang ("Liang"), alleges as follows:

**SUMMARY**

1.       This case involves serial insider trading conducted by Liang, a chemist employed

by the U.S. Food and Drug Administration ("FDA"), beginning as early as July 2006 and

continuing through the present.  By virtue of his employment at the FDA, Liang was privy to

highly confidential information related to FDA drug approvals.  This significant information,

when disclosed, had a material impact on the stock price and/or trading volume of the public companies associated with the relevant drugs.  In breach of his duties as a federal employee not to engage in financial transactions using nonpublic government information and not to use such information for his personal benefit, Liang used this material, nonpublic information to trade improperly in advance of over two dozen FDA drug approval decisions.  In doing so, Liang generated a combined total of over $3.6 million in illegal profits and losses avoided.

2.      The SEC's investigation uncovered that Liang engaged in unlawful insider trading in advance of at least 27 different announcements concerning FDA decisions on drug applications involving 19 different publicly-traded companies.  Liang purchased stock for a profit before nineteen positive announcements; short sold stock for a profit before six negative announcements; and sold stock to avoid losses before two negative announcements.

3.      Liang went to great lengths to conceal this unlawful trading.  He did not conduct any of the trades through his own or his wife's personal brokerage accounts.  Instead, he effected the trades through seven brokerage accounts in the names of five nominees, relief defendants Andrew Liang, Hui Juan Chen, Zhongshan Chen, Shuhua Zhu, and Honami Toda.  Although none of the accounts were in Liang's name, he directed trading in the accounts.  Most of the proceeds transferred out of the nominee accounts were transferred to Citibank and deposited into a bank account in the name of Liang and his wife, relief defendant Yi Zhuge.  Despite being required to do so, Liang did not disclose any of his unlawful trading to the FDA.

4.      By knowingly or recklessly engaging in the conduct described in this Complaint, Defendant Cheng Yi Liang violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule

10b-5 [17 C.F.R. § 240.10b-5] thereunder.  Liang should be enjoined from doing so, ordered to disgorge his illicit profits with prejudgment interest, and ordered to pay civil monetary penalties.

## JURISDICTION AND VENUE

5.     The Commission brings this action pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Sections 21(d) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u-1], to enjoin such transactions, acts, practices, and courses of business, and to obtain disgorgement, prejudgment interest, civil money penalties, and such other and further relief as the Court may deem just and appropriate.

6.     This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21(d), 21(e), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78u-1, and 78aa].

7.     Venue in this district is proper under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the transactions, acts, practices, and courses of business constituting the violations alleged herein occurred within the District of Maryland and elsewhere, and were effected, directly or indirectly, by making the use of the means or instruments or instrumentalities of transportation or communication in interstate commerce, or of the mails, or the facilities of a national securities exchange.

## THE DEFENDANT

8.     **Defendant Cheng Yi Liang**, age 57, resides in Gaithersburg, Maryland and throughout the relevant period has been employed by the FDA as a chemist in its Center for Drug Evaluation and Research.

3

**THE RELIEF DEFENDANTS**

9.      **Yi Zhuge**, age 54, resides in Gaithersburg, Maryland.  She is Liang's wife and is listed as the beneficiary on one of the brokerage accounts through which Liang traded and as having power of attorney over another.  Some of the other brokerage accounts through which Liang traded were used to write checks to Zhuge, which were deposited in a bank account she shares with Liang.

10.      **Andrew Liang**, age 25, resides in Gaithersburg, Maryland.  He is Liang's son. Liang traded ahead of thirteen FDA drug approval announcements through two brokerage accounts in Andrew Liang's name.

11.      **Hui Juan Chen**, age 84, is a citizen of China with a permanent residence in Shanghai.  She is Liang's mother.  Liang traded ahead of all 27 FDA drug approval announcements through a brokerage account in Hui Juan Chen's name.

12.      **Zhongshan Chen**, age 56, is a citizen of China with a permanent residence in China.  Liang traded ahead of sixteen FDA drug approval announcements through two brokerage accounts in Zhongshan Chen's name.

13.      **Shuhua Zhu**, age 55, is listed on brokerage account documentation as residing in Rockville, Maryland.  Liang traded ahead of five FDA drug approval announcements through a brokerage account in Shuhua Zhu's name.

14.      **Honami Toda**, age 53, is a citizen of Japan with a permanent residence in Japan. According to brokerage account documentation, she also has a residence in Rockville, Maryland.  Liang traded ahead of seven FDA drug approval announcements through a brokerage account in Honami Toda's name.

## RELEVANT ENTITIES

15.     **The Center for Drug Evaluation and Research ("CDER")** is a part of the U.S. Food and Drug Administration ("FDA").  The FDA is an agency of the U.S. Department of Health and Human Services ("HHS"), one of the executive departments of the U.S. government. CDER regulates over-the-counter and prescription drugs.  CDER's offices are located in Silver Spring, Maryland.

16.     **Adolor Corporation ("Adolor")** is a Delaware corporation headquartered in Exton, Pennsylvania.  At all relevant times, Adolor's common stock was registered with the Commission pursuant to Section 12 of the Exchange Act and traded on NASDAQ.  The company sponsored FDA review of the drug "Entereg."

17.     **Anesiva, Inc. ("Anesiva")** is a Delaware corporation headquartered in South San Francisco, California.  At all relevant times, Anesiva's common stock was registered with the Commission pursuant to Section 12 of the Exchange Act and traded on NASDAQ.  The company sponsored FDA review of the drug "Zingo."

18.     **Clinical Data, Inc. ("Clinical Data")** is a Delaware corporation headquartered in Newton, Massachusetts.  At all relevant times, Clinical Data's common stock was registered with the Commission pursuant to Section 12 of the Exchange Act and traded on NASDAQ.  The company sponsored FDA review of the drug "Viibryd."

19.     **Connetics Corporation ("Connetics")** was a Delaware corporation headquartered in Palo Alto, California.  At all relevant times, Connetics' common stock was registered with the Commission pursuant to Section 12 of the Exchange Act and traded on NASDAQ.  The company sponsored FDA review of the drug "VersaFoam."

20. **Cornerstone Therapeutics, Inc. ("Cornerstone")** is a Delaware corporation headquartered in Cary, North Carolina. At all relevant times, Cornerstone's common stock was registered with the Commission pursuant to Section 12 of the Exchange Act and traded on NASDAQ. The company agreed to jointly promote the drug "Perforomist" with a company that sponsored its FDA review and sponsored FDA review of the drug "Zyflo."

21. **CV Therapeutics, Inc. ("CV Therapeutics")** was a Delaware corporation headquartered in Palo Alto, California. At all relevant times, CV Therapeutics' common stock was registered with the Commission pursuant to Section 12 of the Exchange Act and traded on NASDAQ. The company sponsored FDA review of the drug "Lexiscan."

22. **Encysive Pharmaceuticals Inc. ("Encysive")** was a Delaware corporation headquartered in Houston, Texas. At all relevant times, Encysive's common stock was registered with the Commission pursuant to Section 12 of the Exchange Act and traded on NASDAQ. The company sponsored FDA review of the drug "Thelin."

23. **EPIX Pharmaceuticals, Inc. ("EPIX")** was a Delaware corporation headquartered in Lexington, Massachusetts. At all relevant times, EPIX's common stock was registered with the Commission pursuant to Section 12 of the Exchange Act and traded on NASDAQ. The company sponsored FDA review of the drug "Vasovist."

24. **MannKind Corp. ("MannKind")** is a Delaware corporation headquartered in Valencia, California. At all relevant times, MannKind's common stock was registered with the Commission pursuant to Section 12 of the Exchange Act and traded on NASDAQ. The company sponsored FDA review of the drug "Afrezza."

25. **Middlebrook Pharmaceuticals, Inc. ("Middlebrook")** was a Delaware corporation headquartered in Westlake, Texas. At all relevant times, Middlebrook's common

stock was registered with the Commission pursuant to Section 12 of the Exchange Act and traded on NASDAQ.  The company sponsored FDA review of the drug "Moxatag."

26.     **Momenta Pharmaceuticals, Inc. ("Momenta")** is a Delaware corporation headquartered in Cambridge, Massachusetts.  At all relevant times, Momenta's common stock was registered with the Commission pursuant to Section 12 of the Exchange Act and traded on NASDAQ.  The company developed the drug "Enoxaparin" which FDA review was sponsored by a partner company.

27.     **Novadel Pharmaceuticals, Inc. ("Novadel")** is a Delaware corporation headquartered in Bridgewater, New Jersey.  At all relevant times, Novadel's common stock was registered with the Commission pursuant to Section 12 of the Exchange Act and traded on the NYSE Amex.  The company sponsored FDA review of the drugs "Xcytrin" and "ZolpiMist."

28.     **Pharmacyclics, Inc. ("Pharmacyclics")** is a Delaware corporation headquartered in Sunnyvale, California.  At all relevant times, Pharmacyclics' common stock was registered with the Commission pursuant to Section 12 of the Exchange Act and traded on NASDAQ.  The company sponsored FDA review of the drug "Xcytrin."

29.     **Pozen Inc. ("Pozen")** is a Delaware corporation headquartered in Chapel Hill, North Carolina. At all relevant times, Pozen's common stock was registered with the Commission pursuant to Section 12 of the Exchange Act and traded on NASDAQ.  The company sponsored FDA review of the drugs "Treximet" and "Vimovo."

30.     **Progenics Pharmaceuticals, Inc. ("Progenics")** is a Delaware corporation headquartered in Tarrytown, New York.  At all relevant times, Progenics' common stock was registered with the Commission pursuant to Section 12 of the Exchange Act and traded on NASDAQ.  The company sponsored FDA review of the drug "Relistor."

31.     **Santarus, Inc. ("Santarus")** is a Delaware corporation headquartered in San Diego, California. At all relevant times, Santarus' common stock was registered with the Commission pursuant to Section 12 of the Exchange Act and traded on NASDAQ.  The company sponsored FDA review of the drug "Zegerid" and licensed the drug "Zegerid OTC" to another company that sponsored its FDA review.

32.     **Somaxon Pharmaceuticals, Inc. ("Somaxon")** is a Delaware corporation headquartered in San Diego, California.  At all relevant times, Somaxon's common stock was registered with the Commission pursuant to Section 12 of the Exchange Act and traded on NASDAQ.  The company sponsored FDA review of the drug "Silenor."

33.     **Spectrum Pharmaceuticals ("Spectrum")** is a Delaware corporation headquartered in Irvine, California.  At all relevant times, Spectrum's common stock was registered with the Commission pursuant to Section 12 of the Exchange Act and traded on NASDAQ.  The company sponsored FDA review of the drug "LEVOleucovorin."

34.     **Vanda Pharmaceuticals Inc. ("Vanda")** is a Delaware corporation headquartered in Rockville, Maryland.  At all relevant times, Vanda's common stock was registered with the Commission pursuant to Section 12 of the Exchange Act and traded on NASDAQ.  The company sponsored FDA review of the drug "Iloperidone."

## FACTS

### Liang's Work at the FDA

35.     Liang has been employed as a chemist at the FDA since 1996.  Since at least 2001, Liang has worked in the FDA's Center for Drug Evaluation and Research ("CDER"), which evaluates new drug applications before drugs can be sold in the United States.

36.     Before a new drug can be sold in the United States, the drug's "sponsor" – typically a company hoping to sell the drug or with a financial interest in the drug – must submit a new drug application to the FDA's CDER, which evaluates the drug for safety and effectiveness.

37.     Once the application is submitted, the CDER has 60 days to review the application.

38.     The Prescription Drug User Fee Act ("PDUFA") [21 U.S.C. § 301, et. seq.] requires the CDER to review and act upon at least 90% of new drug applications for standard drugs no later than 10 months after the application is received (six months for priority drugs). The date by which the CDER is required to act is commonly referred to as the "PDUFA date."

39.     With the exception of generic drug applications which do not have PDUFA dates, PDUFA dates are publicly known, as the "sponsors" typically announce the dates in press releases and filings.

40.     After an application is filed and accepted for review, a CDER review team consisting of medical doctors, chemists, statisticians, microbiologists, pharmacologists, and other experts evaluates whether the studies submitted by the sponsor show that the drug is safe (i.e., the benefits outweigh the risks) and effective for its proposed use.

41.     If the CDER determines that the drug is safe, it will approve the drug.  The CDER does not reject new drug applications.  Rather, if the CDER determines that problems exist with the application or that it needs more information for its review, the CDER issues a "complete response letter" in which it describes specific deficiencies in the application and requests additional studies or information.

42.     If a sponsor receives a complete response letter, it may meet with CDER officials to discuss the deficiencies.  Once the sponsor meets with CDER officials, the sponsor may correct any deficiencies and submit new information, request a hearing, or withdraw its application altogether.  When a sponsor submits information in response to a complete response letter and the CDER accepts it, a new PDUFA date is assigned.

43.     The FDA's drug reviews are nonpublic.  The FDA is prohibited from disclosing that a new drug application has been filed, the existence of a review, or that it has issued a complete response letter.  The FDA only discloses information when it approves a new drug.

44.     The CDER's practice is to issue a press release 24 hours after it has notified the sponsor that its drug has been approved.  The sponsor, however, may disclose earlier that it has submitted a new drug application, received a complete response letter, or received approval for its drug.

45.     By virtue of his position within CDER, Liang was privy to the details and results of  the FDA reviews prior to any public announcement of the results. Upon information and belief, Liang had computer access to the nonpublic records of the review process for each drug examined by the office and routinely used that access to improperly obtain material nonpublic information.

## Liang Owed a Duty of Trust and Confidence to the FDA

46.     When employees begin their employment at the FDA, and at various times thereafter, they are provided with HHS rules governing the use of official information.   These rules, among other things, state:

> Government employees are sometimes able to obtain information about some action the Government is about to take or some other matter which is not generally known. Information of this kind shall not be used by the employee to further his/her or someone else's private financial or other interests.  Such a use of official information is clearly a

> violation of a public trust.  Employees shall not, directly or indirectly, make use of, or permit others to make use of, for the purpose of furthering a private interest, official information not made available to the general public.

45 C.F.R. § 73.735-307(a)(4) (Standards of Ethical Conduct for Employees of HHS – Conduct on the Job – Use of Official Information).

47.     The above-quoted rule, which was specifically applicable to HHS employees, was derived from the *Standards of Ethical Conduct for Employees of the Executive Branch*, which provides that "[a]n employee shall not engage in a financial transaction using nonpublic information, nor allow the improper use of nonpublic information to further his own private interest or that of another, whether through advice or recommendation, or by knowing unauthorized disclosure."  5 C.F.R. § 2635.703(a).

48.     This standard is based on the general principle that "[p]ublic service is a public trust.  Each employee has a responsibility to the United States Government and its citizens to place loyalty to the Constitution, laws and ethical principles above private gain."  5 C.F.R. § 2635.101(a).

49.     FDA employees are required to certify that they received a copy of the *Standards of Ethical Conduct* and the FDA's Supplemental Regulations on Employee Conduct and that they understand that they are personally responsible for complying with the Standards and Employee Conduct regulations.

50.     Upon information and belief, Liang was provided with the rules governing the use of official information, the Standards of Ethical Conduct, and FDA's Supplemental Regulations on Employee Conduct, and certified that he understood their requirements.

51.     Certain employees at the FDA, including Liang (along with his spouse or minor children), are also expressly prohibited from holding financial interests in companies which are

"significantly regulated" by the FDA.  *See* 5 C.F.R. § 5501.104(a) (Supplemental Standards of Ethical Conduct for Employees of HHS – Prohibited financial interests applicable to the employees of the FDA).

52.      A "significantly regulated" company is one in which the sales of FDA-regulated products constitute ten percent or more of the company's annual gross sales in the previous fiscal year.  Where a company does not have a record of sales of FDA-regulated products, it is considered significantly regulated if its operations are solely in fields regulated by the FDA.  5 C.F.R. § 5501.101(c)(2).

53.      The FDA maintains for its employees a list of all U.S. companies publicly traded on U.S. stock exchanges.  Certain public companies are categorized on the list as either "Significantly Regulated" or "Acceptable" companies.  If an employee is interested in trading stock in a company that does not appear under either category, the FDA requires the employee to contact an Ethics Counselor before trading in the company's stock.

54.      Liang, as an FDA employee, was advised of this policy upon beginning his employment and on numerous subsequent occasions.

55.      Upon information and belief, Liang expressly agreed to comply with this policy.

56.      Notwithstanding the limitations imposed by the FDA on trading in the securities of "significantly regulated" companies, the FDA also requires certain employees, including Liang, to file annual financial disclosure reports which require disclosure of **all** securities holdings, as well as any purchases, sales or exchanges by the filer during the year in transactions that exceed $1,000.  *See* 5 C.F.R. § 2634.303.

**Liang Misappropriated Material  Nonpublic Information from the FDA**

57.     Liang abused his position of trust with the FDA by obtaining, through his office computer or otherwise, material nonpublic information relating to at least 27 different FDA drug reviews.  The material nonpublic information was the details of the FDA review including the undisclosed result of the confidential review conducted by the FDA's CDER office.

58.     Liang unlawfully misappropriated this material nonpublic information for his own personal gain by trading in the securities of the publicly-traded company that sponsored or had agreements with the sponsor regarding the drug subject to the FDA review on the basis of the confidential results of that review.

59.     From at least July 2006 through the present, Liang traded successfully in advance of at least 27 announcements.

60.     Liang purchased shares for a profit before nineteen positive announcements; short sold shares for a profit before six negative announcements; and sold shares to avoid losses before two negative announcements.  In each case, Liang traded successfully in the same direction as the announcement.

61.     Liang traded in the securities of developmental drug companies, as opposed to larger drug companies.  With respect to developmental drug companies, an FDA decision, positive or negative, would likely have a significant impact on the stock price of the drug company, and therefore generate a greater opportunity to profit.

62.     Subsequent to the public announcement of the FDA decision, the stock price of the affected public company typically increased or decreased materially depending on whether the announcement was favorable or negative.  In the small number of instances where the stock price was not significantly impacted, the volume of trading increased dramatically.

13

63.     Liang was successful in his misuse of the material, nonpublic information, as his profits and avoided losses for each announcement ranged from $1,324 to $1,040,809, and averaged $135,015.

64.     Liang failed to disclose any of the trading described above in his financial disclosure reports that he attested to and submitted to his employer, despite the fact that he was required to disclose any purchases, sales or exchanges of securities [in excess of $1,000] during the year covered by each disclosure.  *See* 5 C.F.R. § 2634.303.

### Liang's Unlawful Insider Trading Through Nominee Accounts

65.     Liang typically began building his stock position (whether long or short) two to three weeks before an expected PDUFA (announcement) date.

66.     Liang typically traded in two or more nominee accounts at a time.

67.     While the nominee accounts were not in Liang's name, numerous facts demonstrate that Liang controlled and directed the trading in the accounts.

68.     The account information on the nominee accounts reveal that many of the accounts list either Liang or his wife's address, phone number, or email address as points of contact.

69.     Much of the trading in the accounts occurred online through similar Internet Protocol ("IP") addresses associated with Liang's personal internet accounts.

70.     Telephone numbers billed to Liang or which he controlled were used to call the brokerage firms where the nominee accounts were held and access account information, obtain stock quotes for the relevant securities and place trades.

71.     The majority of the proceeds transferred out of the nominee accounts were transferred to bank accounts in Liang's name.

72.     At times, checks were written from the nominee accounts directly to Liang or his wife.  Checks were also written from the nominee accounts to pay credit card accounts in Liang's or his wife's name.  In at least one instance, Liang funded trading in one of the nominee accounts.

73.     The majority of the trading in the nominee accounts was in companies awaiting decisions from the FDA on their drug applications – information that Liang was uniquely positioned to obtain.

74.     For example, one of the nominee accounts was a brokerage account in the name of Hui Juan Chen opened at TD Waterhouse (now known as TD Ameritrade) in December 2000.

  a.  Chen is Liang's 84-year-old mother.  The account application listed Chen as a Chinese citizen, with a permanent residence in Shanghai, China.

  b.  The mailing address listed on the application, however, was Liang's home address.  Moreover, the application provided a telephone number that was Liang's home telephone number.

  c.  IP logs from January 2007 to the present show that the account was rarely, if ever, accessed from IP addresses located in China.  Rather, virtually all of the IP addresses were located in the United States.

  d.  Improper trading in this account in advance of several FDA announcements was directed from IP addresses within the United States and associated with Liang's personal Verizon internet account as well as AT&T Wireless IP addresses which, upon information and belief, were associated with Liang.

75.     In January 2003, another brokerage account used by Liang as a nominee account was opened in the name of Shuhua ("Susan") Zhu at Scottrade.

    a.   According to the application, Zhu was employed by Johnson & Johnson in medical sales in Rockville, Maryland.

    b.   The account application listed Liang's home address as Zhu's mailing address, and Liang's home and work telephone numbers at the time, as Zhu's primary telephone numbers.

    c.   Improper trading in this account in advance of several FDA announcements was directed from the identical IP address associated with Liang's Verizon internet account that directed contemporaneous improper trading in other nominee accounts.

76.      In December 2004, a brokerage account used by Liang as a nominee account was opened in the name of Andrew Liang at Scottrade.

    a.   Andrew Liang is Liang's 25-year-old son.

    b.   The account application listed Liang's home address and telephone number as the mailing address and primary telephone number on the account.

    c.   In March 2009, Andrew Liang moved to within a few miles from his parents' home and changed his address on the account.

    d.   Andrew Liang also changed his telephone number on the account to a cell phone number billed to, and used by, his father, Liang.

    e.   Improper trading in this account in advance of several FDA announcements was directed from the identical IP address associated with Liang's Verizon internet account that directed contemporaneous improper trading in other nominee accounts.

   f. Improper trading in this account in advance of FDA announcements was also

    at times directed from an IP address associated with AT&T Wireless IP

    addresses which, upon information and belief, were associated with Liang.

  77. In March 2009, an IRA account was opened at Scottrade in Andrew Liang's name

but used by Liang as a nominee account.

   a. The account listed Andrew Liang's new address as the mailing address and

    Liang's cell phone number as the telephone number on the account.

   b. Andrew Liang's mother was listed as the account's beneficiary.

   c. Improper trading in this account in advance of several FDA announcements

    was directed from the identical IP addresses associated with Liang's Verizon

    internet account that directed contemporaneous improper trading in other

    nominee accounts.

   d. Improper trading in this account in advance of FDA announcements was also

    at times directed from an IP address associated with AT&T Wireless IP

    addresses which, upon information and belief, were associated with Liang.

  78. In April 2007, another nominee account was opened in the name of Honami Toda

at TD Ameritrade.

   a. The account application listed Toda as a non-resident alien.  The application

    listed an address and telephone number that was the same mailing address and

    telephone number as an independent Chinese school system in the

    Washington area.

   b. Based on IP logs for this account, there are instances in which this account is

    accessed from IP addresses located in China.

    c.   However, all but four trades were placed using IP addresses located in the United States, including addresses associated with Liang's personal Verizon internet account.

    d.   Improper trading in this account in advance of several FDA announcements was directed from the identical IP address associated with Liang's Verizon internet account that directed contemporaneous improper trading in other nominee accounts.

79.    Nominee brokerage accounts in the name of Zhongshan Chen were opened at TD Ameritrade in July 2007, and at Scottrade in November 2007.

    a.   The account applications listed Chen as a Chinese citizen and as an agent for AIG Insurance Co. in Shanghai, China.

    b.   The TD Ameritrade application listed Liang's home address as the mailing address, and the cell phone number for Liang's wife as the telephone number on the account.

    c.   The Scottrade application listed an address across the street from Liang as Chen's mailing address and Liang's wife's cell phone number, as a telephone number for Chen.

    d.   According to the IP logs for these accounts, the accounts were accessed on a few occasions from IP addresses located in China.  In most instances, however, they were accessed from IP addresses in the United States.

    e.   Improper trading in this account in advance of several FDA announcements was directed from the identical IP addresses associated with Liang's Verizon

internet account that directed contemporaneous improper trading in other
nominee accounts.

    f.    Improper trading in this account in advance of FDA announcements was also
at times directed from an IP address associated with AT&T Wireless IP
addresses which, upon information and belief, were associated with Liang.

80.    The "IP" trail associated with Liang's trading in the nominee accounts reveals a
similar pattern with respect to Liang's trading in each of the targeted companies.  On days that
Liang logged into multiple brokerage accounts, he usually logged into each of the accounts
sequentially using the same IP address across all of the accounts for that day.

81.    The conduct of Liang in carrying out the fraudulent scheme with respect to the 27
FDA announcements followed the pattern as described in detail below:

### Liang's Trading in Clinical Data, Inc.

82.    In May 2010, Clinical Data, Inc. ("Clinical Data") announced that the FDA
accepted for review its new drug application for Viibryd, a drug to treat major depressive
disorder, and had set a PDUFA (announcement) date for the results of its review of January 22,
2011.

83.    On January 6, 2011, Liang began buying Clinical Data shares.

84.    Between 9:38 a.m. and 11:43 a.m., Liang purchased 16,000 shares of Clinical
Data in the Hui Juan Chen, Andrew Liang and Zhongshan Chen accounts, investing over
$243,000 to purchase the shares.

85.    The shares were purchased sequentially in each account using the same IP address
linked to Liang's personal Verizon internet account.

86.     At approximately 3:00 p.m. that day, Liang logged into and accessed an FDA proprietary database that uploads and archives key documents relating to the FDA's review of drug applications and tracks the status of the reviews.

87.     Between approximately 3:00 p.m. on January 6, 2011 and 1:43 p.m. on January 7, 2011, when he next purchased Clinical Data shares (2,000 shares in the Hui Juan Chen account), Liang accessed Viibryd's application history in the FDA database twice and reviewed at least five archived documents.

88.     Liang's next purchase was on Monday, January 10, 2011, at 2:59 p.m., when he purchased 1,000 shares in the Hui Juan Chen account using the IP address linked to his Verizon account.

89.     Between his purchases on January 7 and 10, 2011, Liang accessed Viibryd's application history three times and reviewed at least two archived documents, including a confidential memorandum from the CDER Office recommending Viibryd's approval.

90.     Between January 12 and 14, 2011, Liang purchased 8,800 shares of Clinical Data for over $134,000.  Liang purchased the shares by accessing nominee accounts using the IP address linked to his Verizon account.

91.     During this time, Liang accessed Viibryd's application history nine more times and reviewed new confidential documents that had been uploaded concerning the review.

92.     During the period January 15 to 17, 2011, which included the Martin Luther King, Jr. federal holiday, Liang did not trade.

93.     However, starting early morning on January 18, 2011, Liang again began trading in the nominee accounts.  Between 8:15 a.m. and 8:25 a.m., Liang sold 72,200 shares of Citigroup in the Hui Juan Chen, Zhongshan Chen and Andrew Liang accounts for almost

$356,000.  The shares were sold using the same IP address linked to Liang's Verizon internet account.

94.     Citigroup was the only security, other than Clinical Data, in the three accounts at the time.  Liang sold all of the Citigroup shares in the accounts and used almost two-thirds of the proceeds to purchase additional Clinical Data shares.

95.     Between January 18 and 21, 2011, Liang purchased 19,075 additional shares of Clinical Data for over $295,000.  Liang purchased the shares using an IP address linked to his Verizon internet account and using an AT&T Wireless IP address.

96.     During this January 18-21 time period, Liang again accessed the application history for Viibryd eight additional times and reviewed confidential documents that had been uploaded and archived.

97.     In total, Liang purchased 46,875 shares of Clinical Data for $717,924.

98.     On January 21, 2011, after the markets closed, the FDA issued a press release approving Viibryd.

99.     As a result, Clinical Data's share price increased from $15.03 a share at close on January 21, 2011, to $25.17 a share at close on January 24, 2011, or 67%.

100.    On January 24, 2011, the next trading day, Liang sold, in less than 15 minutes, all 46,875 shares of Clinical Data in the nominee accounts for a profit of $379,602.

101.    Liang sold the shares using the IP address linked to his Verizon account.  The next day, using the same Verizon IP address, Liang purchased 80,000 shares of Citigroup in the three accounts.

## Liang's Trading in Encysive, Inc.

102.     Liang's trading in Encysive followed a similar pattern.  On June 15, 2006, Encysive announced that the FDA had accepted the information it had submitted in response to questions earlier raised by the FDA concerning its new drug application for Thelin, a drug to treat pulmonary arterial hypertension, and that the FDA had assigned a PDUFA (announcement) date of July 24, 2006.

103.     Despite this seemingly positive announcement, between July 3 and 24, 2006, Liang established a combined short position of 31,000 shares at prices ranging from $5.93 to $6.98 per share in the Hui Juan Chen and Shuhua Zhu accounts.

104.     The trades were placed online using the same IP addresses for both accounts.  The accounts had not previously traded in Encysive stock.

105.     Upon information and belief, during this period, Liang accessed confidential FDA information and learned that approval for the drug was not forthcoming.

106.     On July 24, 2006 (4:22 p.m.), Encysive announced that it had received another complete response letter from the FDA, indicating that the drug had not yet been approved, causing its stock to drop from $6.18 a share to $3.69 a share, or 40%.

107.     The sharp decline allowed the Liang-controlled accounts to cover their 31,000-share short position (using the same Verizon IP addresses) at prices ranging from $4.01 to $4.04 per share, for a profit of $75,361.

## Liang's Trading in Somaxon, Inc.

108.     In January 2008, a small drug company called Somaxon submitted its application for Silenor, a drug to treat insomnia, for FDA review.  In April 2008, the FDA accepted the application for review and provided a target PDUFA date of December 2008.  After a series of

delays, Somaxon issued a press release on January 21, 2010, stating that it anticipated an FDA

decision by March 21, 2010.

109.     On March 18, 2010, between 8:43 a.m. and 11:18 a.m., Liang bought 40,313

shares of Somaxon, for prices ranging from $3.85 to $3.97 a share, in the Hui Juan Chen and

Zhongshan Chen accounts using Verizon IP addresses linked to Liang and AT&T Wireless IP

addresses.

110.     Prior to these purchases, upon information and belief, Liang accessed confidential

FDA information and learned that approval for the drug would be granted.

111.     At 11:30 a.m., Somaxon, a California company, issued a press release stating that

the FDA had approved Silenor.

112.     At 12:17 p.m., and in just three-minutes' time, Liang sold all 40,313 shares of

Somaxon at prices ranging from $6.79 to $6.99 a share, for a profit of $119,643.  Liang sold the

shares using the Verizon IP addresses linked to Liang's Verizon account.

### Trading Summary

113.     Liang's unlawful trading followed this pattern with respect to each of 27 different

FDA announcements.  In each case, he obtained confidential information surrounding an FDA

review of a drug associated with the pertinent company, and traded on the basis of that

information.  His conduct is summarized in the table below:

| Stock (Ticker Symbol) | Dates Purchased (Sold/Shorted) | Shares Bought (Sold/Shorted)/ Avg. Price Per Share | Announcement Date/Time | Dates Sold (Covered) | Shares Sold (Covered)/ Avg. Price Per Share | Profits (Losses Avoided) |
|---|---|---|---|---|---|---|
| Encysive (ENCY) | (July 3 - 24, 2006) | (31,000 shares)/ $6.45 | July 24, 2006, 4:22 pm (negative) | (July 27, 2006) | (31,000 shares)/ $4.02 | $75,361 |
| Connetics (CNCT) | Sept. 8 - 19, 2006 | 20,000 shares/ $10.36 | Sept. 19, 2006, 6:41 pm | Sept. 20, 2006 | 20,000 shares/ $11.15 | $15,700 |

| Stock (Ticker Symbol) | Dates Purchased (Sold/Shorted) | Shares Bought (Sold/Shorted)/ Avg. Price Per Share | Announcement Date/Time | Dates Sold (Covered) | Shares Sold (Covered)/ Avg. Price Per Share | Profits (Losses Avoided) |
|---|---|---|---|---|---|---|
| Cornerstone (CRTX) | Apr. 19 - May 14, 2007 | 94,200 shares/ $2.00 | May 14, 2007, 6:30 am | May 15, 2007 | 89,200 shares/ $2.50 | $42,698 |
| Cornerstone (CRTX) | May 15 - 30, 2007 | 50,000 shares/ $2.50 | May 31, 2007, 7:00 am | May 31 - June 11, 2007 | 55,000 shares/ $3.36 | $50,750 |
| Encysive (ENCY) | (June 1 - 14, 2007) | (61,000 shares)/ $4.49 | June 15, 2007, 6:46 pm (negative) | (June 18, 2007) | (61,000 shares)/ $2.03 | $150,324 |
| Pozen (POZN) | (Aug. 1, 2007) | (29,520 shares)/ $15.40 | Aug. 2, 2007, 8:31 am (negative) | | | ($174,409) |
| Anesiva (ANSV) | Aug. 2 - 16, 2007 | 5,000 shares/ $6.09 | Aug. 17, 2007, 6:30 am | Aug. 17, 2007 | 5,000 shares/ $6.36 | $1,324 |
| Momenta (MNTA) | (Nov. 5, 2007) | (20,000 shares)/ $13.41 | Nov. 6, 2007, 7:33 am (negative) | (Nov 6, 2007) | (20,000 shares)/ $6.88 | $130,675 |
| Pharmacyclics (PCYC) | (Dec. 20 - 21, 2007) | (25,000 shares)/ $2.29 | Dec. 21, 2007, 7:00 pm (negative) | (Dec. 31, 2007 - Jan. 7, 2008) | (25,000 shares)/ $1.49 | $20,058 |
| Progenics (PGNX) | (Jan. 9, 2008) | (5,000 shares)/ $17.70 | Jan. 10, 2008, 8:00 am (negative) | (Jan. 10, 2008) | (5,000 shares)/ $16.60 | $5,500 |
| Middlebrook (MBRK) | Jan. 10 - 23, 2008 | 149,575 shares/ $1.29 | Jan. 24, 2008, 3:04 pm | Jan. 24, 2008 | 149,575 shares/ $3.07 | $267,047 |
| Spectrum (SPPI) | Feb. 27 - Mar. 7, 2008 | 180,000 shares/ $2.50 | Mar. 7, 2008, 5:44 pm | Mar. 10,2008 | 180,000 shares/ $3.00 | $88,470 |
| CV Therapeutics (CVTX) | Mar. 14 - 27, 2008 | 58,900 shares/ $6.26 | Apr. 10, 2008, 7:18 pm | Apr. 11 - 14, 2008 | 58,900 shares/ $8.03 | $103,607 |
| Pozen (POZN) | Apr. 15, 2008 | 19,155 shares/ $10.78 | Apr. 15, 2008, 8:58 pm | Apr. 16, 2008 | 19,155 shares/ $14.70 | $75,007 |
| Progenics (PGNX) | Apr. 8 - 23, 2008 | 85,000 shares/ $7.49 | Apr. 24, 2008, 8:58 pm | Apr. 25, 2008 | 85,000 shares/ $12.94 | $463,761 |

| Stock (Ticker Symbol) | Dates Purchased (Sold/Shorted) | Shares Bought (Sold/Shorted)/ Avg. Price Per Share | Announcement Date/Time | Dates Sold (Covered) | Shares Sold (Covered)/ Avg. Price Per Share | Profits (Losses Avoided) |
|---|---|---|---|---|---|---|
| Adolor (ADLR) | May 2 - 20, 2008 | 75,100 shares/ $6.83 | May 20, 2008, 5:03 pm | May 21, 2008 | 75,100 shares/ $7.21 | $46,485 |
| Vanda (VNDA) | (June 24 - July 25, 2008) | (30,000 shares)/ $4.46 | July 28, 2008, 6:30 am (negative) | (July 28, 2008) | (30,000 shares)/ $1.50 | $88,828 |
| Novadel (NVDL) | Nov. 28 - Dec. 19, 2008 | 175,000 shares/ $0.09 | Dec. 22, 2008, 8:03 am | Feb. 26 - 27, 2009 | 175,000 shares/ $0.23 | $22,910 |
| EPIX (EPIX) | Nov. 24 - Dec. 18, 2008 | 150,300 shares/ $0.38 | Dec. 22, 2008, 3:02 pm | Dec. 22 - 24, 2008 | 150,300 shares/ $0.93 | $81,994 |
| Vanda (VNDA) | Mar. 30 - Apr. 29, 2009 | 125,065 shares/ $1.08 | May 6, 2009, 5:30 pm | May 6 - 14, 2009 | 125,065 shares/ $9.40 | $1,040,809 |
| Santarus (SNTS) | Nov. 18 - 19, 2009 | 20,000 shares/ $4.02 | Dec. 1, 2009, 5:20 pm | Dec. 2, 2009 | 20,000 shares/ $5.36 | $26,820 |
| Santarus (SNTS) | Dec. 3 - 4, 2009 | 23,950 shares/ $4.62 | Dec. 4, 2009, 7:08 pm | Dec. 7, 2009 | 23,950 shares/ $5.00 | $9,287 |
| Somaxon (SOMX) | Mar. 18, 2010 | 40,313 shares/ $3.92 | Mar. 18, 2010, 11:30 am | Mar. 18, 2010 | 40,313 shares/ $6.89 | $119,643 |
| Pozen (POZN) | Apr. 26 - 30, 2010 | 25,000 shares/ $11.14 | Apr. 30, 2010, 4:59 pm | May 3, 2010 | 25,000 shares/ $11.89 | $18,868 |
| Momenta (MNTA) | July 20, 2010 | 9,670 shares/ $11.52 | July 23, 2010, 10:48 am | July 23, 2010 | 9,670 shares/ $20.36 | $85,428 |
| Mannkind (MNKD) | (Jan. 4, 2011) | (18,000 shares)/ $8.41 | Jan. 19, 2011, 3:34 pm (negative) | | | ($60,047) |
| Clinical Data (CLDA) | Jan. 6 - 21, 2011 | 46,875 shares/ $15.32 | Jan. 21, 2011, 5:52 pm | Jan. 24, 2011 | 46,875 shares/ $23.41 | $379,602 |
| | | | | | Total Profits: | $3,410,956 |
| | | | | | Total Losses Avoided: | $234,456 |
| | | | | | TOTAL: | $3,645,412 |

## Liang Acted with Scienter

114.    Liang's conduct was calculated, repeated and egregious.  Liang was a serial insider trader who violated the public's trust for his own profit on numerous occasions.  He misappropriated information from the FDA, which he knew, or had reason to know, was confidential, and traded on that information ahead of at least 27 drug-related announcements over a four-and-a-half year period for his own personal gain.

115.    Liang attempted to conceal his involvement in the unlawful trading in numerous ways.

116.    Instead of trading in his own accounts, Liang concealed his trading by using at least seven nominee accounts.

117.    In addition, Liang concealed his trading by failing to disclose the trading in his annual financial disclosure reports filed with the FDA.

118.    Of the 19 companies associated with the 27 announcements, at least 15 are on the FDA's "significantly regulated" list, which precluded Liang from trading in those securities.

119.    Moreover, Liang typically transferred the unlawful proceeds to himself by writing checks from the nominee accounts to his bank, rather than to himself personally, which he then deposited into his personal bank account, in a further effort to conceal his fraudulent conduct.

120.    The serial nature of Liang's trading over an extended period of time and in violation of the public's trust evidences, at a minimum, highly unreasonable conduct that represents an extreme departure from the standards of ordinary care.

**Liang Improperly Transferred Illicit Funds to the Relief Defendants and Elsewhere**

121.    As described above, from at least July 2006 and continuing through the present, Liang traded based on material nonpublic information before at least 27 FDA drug approval-related announcements for profits of $3,410,956 and avoided losses of $234,456, totaling $3,645,412.

122.    During this time, at least $1.18 million in checks from the nominee accounts were written to (1) Citibank and deposited in bank accounts belonging to Liang and his wife; (2) Liang or his wife directly; or (3) credit card companies for accounts in Liang or his wife's name.

123.    Liang made other transfers from the accounts to benefit himself and his wife.  For example, checks for $33,940 and $30,400 were written to Infiniti and Herson's Honda, respectively, to purchase a luxury Infiniti sedan and a Honda Odyssey minivan registered to Liang and his wife.

124.    In addition, checks totaling approximately $100,000 were written to Hui Juan Chen and checks totaling approximately $570,000 were written to Zhongshan Chen, two of the nominees, and deposited into their bank accounts.

125.    Another approximately $450,000 was wired into Zhongshan Chen's bank accounts.

## FIRST CLAIM FOR RELIEF

### INSIDER TRADING

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

126.    The Commission realleges and reincorporates paragraphs 1 through 125 as if fully set forth herein.

127.    With respect to his trading preceding each FDA announcement described above, Defendant Liang, with scienter, by use of the means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities:

(a) employed devices, schemes, or artifices to defraud;

(b) made untrue statements of material fact or omissions to state material facts necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and/or

(c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit.

128.    By reason of his actions alleged herein, Defendant Liang violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and unless restrained and enjoined will continue to do so.

## SECOND CLAIM FOR RELIEF

### INSIDER TRADING
### Violations of Section 17(a) of the Securities Act

129.    The Commission realleges and reincorporates paragraphs 1 through 125 as if fully set forth herein.

130.    With respect to his trading preceding FDA announcements affecting issuers Encysive (on both July 24, 2006 and June 15, 2007), Pozen (the August 2, 2007 announcement), Momenta (the November 6, 2007 announcement), Pharmacyclics, Progenics (the January 10, 2008 announcement), Vanda (the July 28, 2008 announcement) and Mannkind described above, Defendant Liang, with scienter, by use of the means or instrumentalities of interstate commerce or of the mails, in the offer or sale of securities:

(a)  employed devices, schemes, or artifices to defraud;

(b)  obtained money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or;

(c)  engaged in transactions, practices, or courses of business which operated or would have operated as a fraud or deceit upon the purchaser.

131.  By reason of his actions alleged herein, Defendant Liang violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and unless restrained and enjoined will continue to do so.


## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a judgment:

(i)       finding that the Defendant Liang violated the antifraud provisions of the federal securities laws as alleged herein;

(ii)      permanently enjoining the Defendant from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

(iii)     finding that the relief defendants are in possession of illegally obtained funds to which they have no legitimate claim.

(iv)     ordering the Defendant, as well as the relief defendants, to disgorge unlawfully obtained monies as a result of the actions alleged herein and to pay prejudgment interest thereon;

(v)      ordering Defendant Liang to pay a civil monetary penalty under Section 21A of the Exchange Act [15 U.S.C. § 78u-1]; and

(vi)     granting such other relief as this Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 39 of the Federal Rules of Civil Procedure, Plaintiff demands that this case be tried to a jury.

Dated: March 29, 2011                          Respectfully submitted,


    /s/ David Williams
Matthew T. Martens
A. David Williams [Md. Fed. Bar No.  25297]
Daniel M. Hawke
Sanjay Wadhwa
Antonia Chion
Deborah A. Tarasevich
Ricky Sachar
Carolyn Welshhans
Owen Granke
Counsel for Plaintiff
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C.  20549
Email:    williamsdav@sec.gov (Williams)
Phone: (202) 551-4548 (Williams)
Fax:     (202) 772-9246 (Williams)